IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

TANGELA WILLIAMS,

      Plaintiff,

vs.                                                                   Case No. 1:14-cv-129-MP-GRJ

CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,

      Defendant.

_____/

## REPORT AND RECOMMENDATION

      Plaintiff appeals to this Court from a final decision of the Commissioner of Social

Security (the "Commissioner") denying Plaintiff's applications for disability insurance

benefits and supplemental security income.  Doc. 1.  The Commissioner has answered,

Doc. 9, and both parties have filed briefs outlining their respective positions.  Docs. 14,

15.  Upon due consideration, and for the reasons discussed below, the undersigned

recommends that the Commissioner's decision be affirmed.

## I.  PROCEDURAL HISTORY

      Plaintiff applied for a period of disability, disability insurance benefits (DIB) and

supplemental security income (SSI), alleging disability since September 21, 2006.[1]  (R.

250-53; 257-63.)  Her applications were denied initially, and upon reconsideration.  (R.

85-87; 101-06; 110-14; 327-330.)  Plaintiff then requested a hearing by an

_____

[1]Plaintiff's alleged onset date was amended at the hearing to October 28, 2009.

administrative law judge ("ALJ").  (R. 118-19.)  After the hearing, Plaintiff's applications

were denied in a decision dated February 15, 2013.  (R. 18-31.)  The Appeals Council

denied Plaintiff's request for review.  (R. 1-3.)  This action followed.

## II.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial

evidence.[2] Substantial evidence is more than a scintilla, i.e., the evidence must do more

than merely create a suspicion of the existence of a fact, and must include such

relevant evidence as a reasonable person would accept as adequate to support the

conclusion.[3]

Where the Commissioner's decision is supported by substantial evidence, the

district court will affirm, even if the reviewer would have reached a contrary result as

finder of fact, and even if the reviewer finds that the evidence preponderates against

the Commissioner's decision.[4] The district court must view the evidence as a whole,

taking into account evidence favorable as well as unfavorable to the decision.[5]

However, the district court will reverse the Commissioner's decision on plenary review if

---

[2] *See* 42 U.S.C. § 405(g) (2000).

[3] *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); *accord, Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[4] *Edwards*, 937 F.2d at 584 n.3; *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).

[5] *Foote*, 67 F.3d at 1560; *accord, Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[6]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[7]  The impairment must be severe, making a claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy.[8]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[9]  The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[10]  The Commissioner may satisfy this burden

---

[6] *Keeton v. Dep't Health and Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).

[7] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505(a) (2012) (All further references to 20 C.F.R. will be to the 2012 version unless otherwise specified.).

[8] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[9] *Walker v. Bowen,* 826 F.2d 996, 1002 (11th Cir. 1987); *see also Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001).

[10] *Doughty*, 245 F.3d at 1278 n.2. In *Doughty* the court explained this burden shifting as follows:

> In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.) (Internal citations omitted).

by pointing to the Medical-Vocational Guidelines (the "Grids") for a conclusive determination that a claimant is disabled or not disabled.[11]

However, the ALJ should not exclusively rely on the Grids when "the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion."[12]   In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[13]

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[14]   Such independent evidence may be introduced by a Vocational Expert's ("VE") testimony, but this is not the exclusive means of introducing such evidence.[15]   Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.

---

[11] *Walker*, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

[12] *Wolfe v. Chater*, 86 F.3d 1072, 1077 ( 11th Cir. 1996). *See Jones v. Apfel*, 190 F.3d 1224, 1229 (11th Cir. 1999); *Walker*, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[13] *Walker*, 826 F.2d at 1003.

[14] *Wolfe*, 86 F.3d at 1077-78.

[15] *See id.*

Age is a vocational factor considered by the Commissioner in determining if a claimant is disabled.[16]  The rules and Grids take into consideration that advancing age increasingly limits a persons ability to adjust to other work.[17] Therefore, as a claimant ages, the likelihood of being found disabled increases.[18]  The Commissioner, however, may not apply the age categories mechanically in a borderline situation, and may apply an older age category if the claimant is a few weeks or months away from an older age category.[19]

### III. SUMMARY OF THE RECORD

#### A. Hearing Testimony

The ALJ conducted a hearing on January 3, 2013.  At the hearing, Plaintiff's counsel clarified that the alleged onset date was October 28, 2009 after a prior reconsideration denial.  Plaintiff's counsel argued that this was a case in which the combination of all of Plaintiff's impairments rendered her unable to work.  (R. 39-45.)

Plaintiff testified that she completed high school, and was previously employed at Hardee's, where she was a back line breakfast manager, a kitchen leader, a supervisor, and a trainer.  Plaintiff was only responsible for management duties on the weekends and when the regular manager would go on vacation.  (R. 45-47.)

---

[16]20 C.F.R. § 424.1563(a).

[17]See 20 C.F.R. Pt. 404, subp. P, Appx .2.

[18]20 C.F.R. § 424.1563(a).

[19]20 C.F.R. § 424.1563(b).

Plaintiff previously treated with Meridian Behavioral, but did not have money to go to the doctor at the time of her hearing.  She previously went to therapy once or twice a week.  She took Celexa for depression and mood swings.  (R. 47-52.)

Plaintiff lived alone and her family paid for her apartment.  She stated she was no longer able to work because she was always in pain.  When she stood, she was always leaning to the left or right and her leg shook.  Her back burned when she stood or sat, and she dropped things.  She also testified that she had bad headaches that made her want to sleep.  However, she did not use a cane or assistive device.  Plaintiff could not drive and so her family took her to get groceries.  She cleaned her apartment once every two weeks.  She cooked "fast and easy" things for herself like macaroni and sandwiches.  She did laundry about once a month.  (R. 52-55.)

Plaintiff generally read books during the day to entertain herself, and sat outside and watched the sky.  She saw her family about twice in two weeks, and they took her to the doctor as well.  She also had a few friends in her apartment complex that she visited with from time to time about once a week.  (R. 55-56.)

Upon questioning from her attorney, Plaintiff testified that she was injured on the job in 2006 and had not returned to work since.  At some point, she received worker's compensation and that provided her with insurance.  Once that ran out her family paid for her care.  Plaintiff felt anxious and depressed every day, and it made her not feel like talking, and made her want to stay in the house all day.  If she went out, she wanted to hit someone.  She said that she had those feelings daily.  (R. 56-58.)

When Plaintiff visited with people, her visits were usually fifteen to thirty minutes. When she wanted to act on her violent feelings, she would return inside and bang a

plastic cup against the counter.  Plaintiff said she tried to be "tolerable" around other people, but she had to take them in small doses, and when they would get on her nerves she would walk way or go sit inside the car.  When she was working, she threw dishes around on frustrating days.  (R. 58-59.)

Plaintiff stated that since her onset date she was "more closed in" than she used to be and was angry all the time. She would wake up and then go to sleep crying.  She testified that she just wanted to be by herself.  She would go for a week and a half shut inside her house before she would go outside.  During that time she would listen to music, watch TV, look at a book, and check her mail.  Sometimes a book could not hold her attention, and it took longer to read a book now. (R. 59-63.)

Plaintiff testified that she experienced pain in her waist, the lower part of her back and hips, her legs, and the middle of her back.  The heaviest weight she carried around the house was five pounds  (R. 63.)

A Vocational Expert (VE) also testified at the hearing.  The VE testified that Plaintiff had past relevant work as a fast food cook, and management trainee.  The ALJ asked the VE to assume a younger person with a high school diploma and the same work background as Plaintiff, who could lift and carry ten pounds continuously, twenty pounds frequently, and up to fifty pounds occasionally, sit constantly for six hours, stand for one hour, walk for one hour, occasionally climb ramps, stairs, ladders, and scaffolds, occasionally kneel, crouch, crawl, frequently balance and stoop, and only occasionally have contact with the public, co-workers, and supervisors.  The VE testified that with those restrictions, such an individual could not return to Plaintiff's past relevant work.   However, there were other jobs in the national economy that such a

person could perform including addresser, document preparer, and office helper.  (R. 64-70.)

### B.  Medical Record Evidence

Plaintiff underwent a consultative examination with Robert Greenberg, M.D. on January 10, 2008.  Dr. Greenberg noted that Plaintiff did not put forth full effort during strength and range of motion testing.  Taking that into consideration, he noted a decreased range of motion of the cervical spine, lumbar spine, right shoulder, right hip, and both knees.  There was no other evidence of inflammatory arthritis.  The diagnoses was probable osteoarthritis.  A month later, an x-ray of the cervical spine and right shoulder were essentially normal.  (R. 360-62.)

On January 26, 2012, more than four years after he examined Plaintiff, Dr. Greenberg completed a residual functional capacity evaluation by consulting physician form, supplied by Plaintiff's counsel.  (R. 422-24.)

Plaintiff was seen for a consultative examination with Lance Chodosh, M.D. on May 21, 2009.  Dr. Chodosh noted that Plaintiff was healthy appearing, and independent in activities of daily living.  She was fully oriented, had a normal speech pattern, and quiet affect.  Dr. Chodosh opined that Plaintiff suffered from chronic diffuse pain of uncertain etiology, without significant physical findings to suggest impairment.  It was his opinion that she could stand, walk, sit, stoop, squat, kneel, lift, carry, handle objections, see, hear, and speak normally.  (R. 369-72.)

Plaintiff returned to Dr. Chodosh on August 25, 2010 for a second consultative examination.  Dr. Chodosh noted that Plaintiff's pain behavior limited his functional assessment.  He also stated that "motor function is difficult to assess because of poor

effort, and there are no convincing deficits."  Her manual dexterity was normal, and her

coordination was good.  Her standing balance was generally normal.  Dr. Chodosh

noted that at times Plaintiff lurched like she was going to fall, but he believed this was

behavioral in nature.  Dr. Chodosh opined that based only on the objective evidence,

Plaintiff was able to stand and walk, sit, bend over, and kneel.  She could lift and carry

at least twenty-five pounds.  She could handle objects, see, hear, and speak normally.

(R. 379-82.)

On December 3, 2010, Plaintiff underwent a consultative examination with

Samer Choksi, M.D.  Plaintiff reported that she experienced pain intermittently, and

some days not at all, but other times her joints hurt for a week.  Plaintiff also reported

that she suffered from depression, but said she had never been seen by a medical

professional for this ailment, and had never been placed on medication. Dr. Choksi

noted no edema, cyanosis, or trophic changes to her toes or fingers.  He noted a

decreased range of motion of the bilateral shoulders in all planes but emphasized this

was with "very poor effort on the applicant's part."  Dr. Choksi again noted that "the

applicant makes a very poor attempt at testing" when he attempted to test the range of

motion of Plaintiff's neck, shoulders, and thoracolumbar. Range of motion testing of the

hips, knees, and ankles was not completed as Plaintiff would not attempt them because

of pain.  Supine and seated straight leg lifts were also not performed because Plaintiff

would not attempt them.  Dr. Choksi noted that Plaintiff had a flat affect, appeared to be

depressed, and was easily brought to tears.  X-rays of the hips revealed only mild

degenerative changes.  (R. 385-89.)

Plaintiff underwent a psychological consultative medical examination on December 27, 2010, with William E. Beaty, Ph.D.  Plaintiff reported that she was depressed since her work-related accident in 2006, and she just wanted to be left alone. She reported to Dr. Beaty that during the day, she read a book, ate cereal, listened to the radio, washed dishes, watched TV, and showered.  Dr. Beaty noted that Plaintiff's mood was depressed and angry, and her affect was labile, constricted, and flat.  She was oriented as to person, place, time, and date, and her thought process was intact and organized.  Her thought content was appropriate as to topics discussed. She could count backwards from twenty, recite the alphabet and months of the year, and could do mental arithmetic.  Dr. Beaty noted that she was pleasant and cooperative but very unhappy and sad, and cried some as relating to her pain.  Dr. Beaty diagnosed Plaintiff with pain disorder associated with both psychological factors and a general medical condition, and mood disorder due to pain from body parts injured in fall, with severe depressive features.  (R. 391-93.)

On February 6, 2012, more than a year after he examined Plaintiff, Dr. Beaty completed a mental residual functional capacity assessment by consulting physician form, supplied by Plaintiff's counsel, in which he opined that Plaintiff had several marked and extreme limitations in concentration and pace, and social interaction.  (R. 425-27.)

Plaintiff presented for an evaluation at Meridian Behavioral with Shin Lay Chu, LHMC, on May 26, 2011.  She was referred by Curtis Kirby (PA-C), her primary care provider at Palms Medical in Trenton.  The notes show that Plaintiff wanted help with her depression in connection with her application for disability.  Plaintiff reported she

was experiencing pain, but reported being able to ride her stationary bike and take walks.  The notes reflect that Plaintiff scored in the "moderate" range for depression symptoms, and she was referred to her physician for a possible prescription for anti-depressants.  She was also recommended to continue in counseling.  (R. 420-21.)  Her first followup session was June 7, 2011.  Plaintiff reported problems complying with medication in the past.  The clinician suggested Plaintiff contact vocational rehabilitation, but she did not seem interested.  Plaintiff reported she cleaned the home of an elderly neighbor for money for medications.  (R. 578-79.)  On June 21, 2011, Plaintiff failed to show for a scheduled appointment.  (R. 577.)  On June 28, 2011, the clinician attempted to work on a treatment plan with Plaintiff, but she was fairly down and withdrawn and so it was postponed.  (R. 575.)  Plaintiff returned on July 5, 2011, and Plaintiff discussed ways to make new friends.  Plaintiff was only minimally involved in formulating her treatment plan, but agreed to continue in counseling.  (R. 574.)  Plaintiff presented again on July 19, 2011, and she acknowledged having a couple of good days since her last session. She expressed being angry at herself for falling at her previous job, resulting in her unemployment.  (R. 572-73.)  Plaintiff returned on August 2, 2011, when she admitted she was not using her medication consistently.  (R. 567-68.)

Plaintiff had another session on September 27, 2011.  Her counselor noted that Plaintiff had been inconsistent with her medications, and also recommended a referral to vocation rehabilitation.  The clinician noted that Plaintiff was more engaged in her session but still resistant to treatment recommendations.  The clinician contacted

Plaintiff's primary care provider, who shared that he did not believe she was very motivated to change.  (R. 569-71.)

Plaintiff treated with her primary care provider at Palms Medical Group on November 18, 2011, for a cold.  It was noted that she had a normal range of motion, muscle strength, and stability in all extremities with no pain on inspection.  Plaintiff also demonstrated the appropriate mood and affect.  (R. 431-32.)

Plaintiff saw Shinlay Rivera (Chu), LMHC, again on January 30, 2012.  The clinician noted that she was tired but her affect improved during the session. The clinician also noted that she was progressing well and her engagement in sessions improved.  (R. 565-66.)  Plaintiff next returned on February 13, 2012.  Plaintiff was discouraged about her disability claim after a meeting with her lawyer. Strategies to calm her mind were discussed.  (R. 564.)  Plaintiff returned on February 27, 2012.  It was noted that Plaintiff attended sessions consistently, and was becoming more active in working on herself.  Plaintiff was frustrated with her family, and wanted to get her own income so she would not have to rely on them.  (R. 562-63.)

Plaintiff returned on March 12, 2012, and reported feeling stressed because of issues with her food stamps.  (R. 561.)  Plaintiff had another session on March 29, 2012.  She was irritable, and would get too worked up to discuss the things bothering her.  She reported her sister was staying with her, which made her tense, but was finding happiness couponing.  (R. 559.)  She returned May 2, 2012, and complained that she was not sleeping well because she had family staying with her.  She felt that her family picked on her and did not understand her depression.  (R. 557.)  She returned on May 30, 2012.  She was alert but irritated, reporting family stressors.

Coping strategies were discussed, such as listening to music and taking a walk.  (R. 553)

Plaintiff presented to her primary care provider at Palms Medical Group with complaints of back and right hip pain on June 13, 2012.  She had a normal range of motion, muscle strength, and stability in all extremities with no pain on inspection, and demonstrated the appropriate mood and affect.  Plaintiff was given a prescription for Flexeril and was referred for Chiropractic treatment.  It was noted that she was stable on Celexa. (R. 539-41.)

Plaintiff also saw her counselor Shinlay Rivera (Chu), LMHC, on the same date. She was in mildly good spirits with a flat affect.  She reported that her sleep was slowing improving, as she realized how much sleep and her medications improved her mood. She felt that she was progressing and could get through her "dark days."  (R. 552.)  Plaintiff returned on July 11, 2012, when it was noted that Plaintiff had improved immensely in being able to talk openly about feelings and emotions.  New treatment objectives were developed, such as improving her relationship with her family.  (R. 554.)

Plaintiff was seen for a consultative examination by Raul Zelaya, M.D. on July 12, 2012.  Dr. Zelaya noted that Plaintiff was a well-nourished individual in no acute distress.  His evaluation of all major joints and the lower extremities revealed no evidence of pain, swelling, tenderness, erythema, heat, creptitation, or gross deformity, except for pain in the right and left S-I joint.  Dr. Zelaya noted that there was no evidence of any decreased range of motion of either the upper or lower extremities "although the examinee was very slow in executing ROM exercises," and "the ROM of the cervical spine as well at the lumbar spine was considered within normal limits

although the examinee was very slow in executing ROM exercises." Her motor strength was five out of five, and she was capable of tandem walk, and walking on heels and toes, although slowly. She was able to stoop, squat, and arise from the sitting position to the standing position. Dr. Zelaya noted that Plaintiff's mood and behavior were flat, but she was capable of understanding and following simple commands and was oriented to time, person, and space. Her memory, attention, and concentration were within normal limits, and she had normal comprehension and articulation. X-ray reports showed "mild straightening of the cervical lordosis with mild facet arthopathy, and a lumberization of the first sacral segment with a slight decrease in the lumbar lordosis, but no spastiscity of normal curvature or rotation was identified. X-rays of the left hand were normal. Dr. Zelyay opined that "I believe this examinee would benefit from a thorough psychiatric evaluation regarding what appears to be [] her clinical depression in addition to a conversion disorder since her subjective complaints exceed our clinical objective findings." (R. 522-25; 536.)

Dr. Zelaya also completed a medical source statement of ability to do work-related activities (physical), in which he opined that Plaintiff could continuously lift and carry up to ten pounds, frequently eleven to twenty pounds, and occasionally twenty-one to fifty pounds, and never more than fifty pounds. He opined that Plaintiff could sit, stand, and walk, for an jour at one time without interruption, and sit for six hours, stand for one hour, and walk for one hour in an eight-hour workday. He opined that she was not limited in the use of her hands and feet, and could perform all postural movements occasionally, except for balancing and stooping, which she could perform frequently. He noted that Plaintiff could perform activities like shopping, traveling alone, ambulating

without assistance, walking a block, using public transportation, climbing a few steps, feeding herself, could care for her hygiene, and sort paper/files.  (R. 526-31.)

Plaintiff treated with Shinlay Rivera (Chu), LMHC again on August 15 and 22, 2012.  She reported inconsistent sleep patterns and feeling withdrawn and unmotivated.  The clinician noted Plaintiff was irritable and agitated, but she was dressed appropriately with good hygiene.  She was resistant to increasing her dose of Celexa.  The clinician discussed things that Plaintiff could do to improve her mood, like activities she enjoyed such as: crocheting, couponing, and visiting with neighbors. (R. 550-51; 555-56.)  The counselor noted that she was not certain whether Plaintiff was compliant with her medication, and that Plaintiff seemed to be making good progress until a month ago.  Plaintiff was advised to consult with her primary care practitioner about changing her Celexa dosage or potentially trying a new medication altogether. (R. 537.)

Plaintiff returned on September 12, 2012. She was oriented and tired but seemed to be in a better mood, smiling and laughing during conversation.  Plaintiff was advised to stay compliant with her medications.  Plaintiff expressed feeling "stuck" in her current situation and was discouraged about her disability application.  (R. 549.)

### C.  The ALJ's Decision

The ALJ determined that Plaintiff met the insured status requirements through December 31, 2011, and that she had not engaged in substantial gainful activity since the alleged onset date.  The ALJ found that Plaintiff had the severe impairments of: obesity, arthritis in the lumbar spine and hips, depression, and hypertension, none of which met or equaled the Listings singly or in combination.

The ALJ found that Plaintiff had the RFC to perform light work with the following restrictions: lift and carry ten pounds continuously, twenty pounds frequently, and up to fifty pounds occasionally, but never over fifty pounds.  She was able to sit for six hours, stand for one hour, and walk for one hour in an eight-hour workday.  She was restricted to occasional climbing, kneeling, crouching, and crawling, but able to balance and stoop frequently.  She was limited to occasional contact with the public, supervisors, and coworkers.

In reaching this conclusion, the ALJ only partially credited Plaintiff's complaints, but discredited them to the extent that they were inconsistent with the RFC.

Relying on testimony from the VE, the ALJ found that Plaintiff was not capable of performing her past relevant work, but found that Plaintiff was capable of performing other work existing in substantial numbers in the national economy, such as addresser and document preparer.  Accordingly, the ALJ determined that Plaintiff was not under a disability through the date of the decision.  (R. 18-31.)

## IV. DISCUSSION

Plaintiff raises only one challenge on appeal. Plaintiff argues that "ALJ McGarry's decision is obviously not supported by substantial evidence because no reasonable person would believe, after considering the combined effects of Plaintiff Williams' multiple mental illnesses and physical illnesses, that the Plaintiff is capable of maintaining full time employment."

As discussed above, the standard of review applied by the Court is whether the Commissioner's findings are supported by substantial evidence.  And while Plaintiff argues that "no reasonable person" would conclude that Plaintiff is not disabled,

Plaintiff's challenge actually focuses on whether the ALJ considered all of Plaintiff's impairments in combination when determining whether Plaintiff was disabled.  Doc. 14 at 13.

"When a claimant has alleged [multiple impairments], a claim for [SSI] may lie even though none of the impairments, considered individually, is disabling.[20]  The ALJ must "make specific and well-articulated findings as to the effect of the combination of impairments and to decide whether the combined impairments cause the claimant to be disabled."[21]  The Eleventh Circuit has repeatedly held that an ALJ's finding regarding a claimant's "impairment or combination of impairments" establishes that the ALJ has considered the impact of the combined impairments.[22]

In this case, the ALJ clearly considered Plaintiff's impairments in combination. This is evidenced by the ALJ's statement during step three of the sequential analysis that Plaintiff "does not have an impairment or a combination of impairments" that met or equaled a Listing, and the ALJ's statement that she considered the combined effects of Plaintiff's obesity with her other impairments.  (R. 21.)  As the Eleventh Circuit explained in *Wilson* this statement is sufficient to establish that the ALJ has considered the combined impact of all impairments.  284 F.3d at 1224-25.  The ALJ further explicitly discussed both Plaintiff's mental and physical impairments in great detail

---

[20] *Walker v. Bowen*, 826 F.2d 996, 1001 (11th Cir. 1987).

[21] *Id*.

[22] *Wilson v. Barnhart*, 284 F.3d 1219, 1224-25 (11th Cir. 2002); *Jones v. Dep't of Health & Human Servs.*, 941 F.2d 1529, 1533 (11th Cir. 1991); *Wheeler v. Heckler*, 784 F.2d 1073 (11th Cir. 1986).

throughout the rest of the decision, as well as other evidence of record, such as her

activities of daily living.

Furthermore, the ALJ accounted for both Plaintiff's physical and mental

impairments in Plaintiff's RFC by limiting Plaintiff to light work with restrictions and

limiting her contact with coworkers, the public, and supervisors.  The ALJ's RFC is

supported by substantial evidence in the record.

The notes from Plaintiff's mental health examinations support this conclusion.

The notes from Plaintiff's counseling sessions at Meridian showed that while frequently

irritable, Plaintiff was alert, oriented, and in no acute distress.  The notes further reflect

that she made progress in her counseling.  (R. 537.)   Further, despite Plaintiff's claim

that she did not get along well with others, she was able to relate to her counselor Shin

Lay Rivera (Chu) and she also visited with family and friends about once a week.

Plaintiff was also able to live independently and take care of her personal needs,

prepare simple meals, clean her home and do laundry.  Plaintiff was able to converse

with and describe her symptoms to her providers. Notably, the ALJ pointed out that

multiple providers found that Plaintiff did not put forth full effort on testing.  (R. 385-89.)

Lastly, in evaluating Plaintiff's RFC the ALJ also took into account that Plaintiff's

medical impairments have been treated conservatively, and there was no diagnostic

evidence of any severe muscoskeletal impairment.  (R. 29.)

In evaluating the functional limitations from Plaintiff's impairments, the ALJ

further relied upon the evidence of record that Plaintiff failed to follow-up with all

treatment recommendations, as evidenced by her non-compliance with medication,

resistance to her counselor's recommendation to followup with vocational rehabilitation, and her resistance to changing her dose of Celexa or trying a new medication. (R. 27.)

With regard to Plaintiff's mental limitations, while Plaintiff points to the form filled-out by consultative examiner, William Beaty, Ph.D., a year after his examination,  Dr. Beaty's checkbox form failed to identify any specific mental functional limitations that would make maintaining employment difficult, despite the inclusion of marked and extreme limitations on the form.  (R. 425-27.)

Dr. Beaty's checkbox form is inconsistent with his own examination. Dr. Beaty's examination notes, rather than showing extreme limitations, note that Plaintiff was oriented as to person, place, time and date, her thought processes were intact and organized, her thought content was appropriate to topics discussed, and she had an average level of cognitive ability.  Additionally, when Dr. Beaty examined Plaintiff he found that Plaintiff could perform mental arithmetic accurately and quickly, was pleasant and cooperative, responded to questions and elaborated answers.  (R. 391-93.)  In short, there is no support either in Dr. Beaty's form itself or in Dr. Beaty's notes of examination justifying the marked and extreme limitations Dr. Beaty assessed in the checkbox form.  And as the ALJ pointed out, the check box form was completed by Dr. Beaty more than a year after Dr. Beaty's one-time examination of Plaintiff.  For these reasons, the ALJ' decision to accord Dr. Beaty's opinions on the check box form little weight is supported by substantial evidence.

The fundamental problem with Plaintiff's argument is that she focuses upon the impairments themselves, noted by health professionals, rather than upon evidence of functional limitations caused by the impairments.  The law applicable to Social Security

disability claims requires the ALJ to measure the severity of a claimant's impairments based upon their effect on the claimant's ability to work, and not on the impairments themselves. *See,* 20 C.F.R. § 404.1545(a); *McCruter v. Bowen*, 791 F. 2d 1544, 1547 (11th Cir. 1986).

Because there were no credible medical opinions that Plaintiff had functional impairments such as to prevent work (other than Dr. Beaty's opinion which the ALJ appropriately gave little weight) the ALJ properly relied upon the medical evidence of record in formulating her RFC.  And contrary to Plaintiff's argument the RFC is supported by the opinion of Dr. Zelaya, who opined that Plaintiff could continuously lift and carry up to ten pounds, frequently eleven to twenty pounds, and occasionally twenty-one to fifty pounds, and never more than fifty pounds, could sit, stand, and walk, for an hour at one time without interruption, and sit for six hours, stand for one hour, and walk for one hour in an eight-hour workday.[23]

Accordingly, the Court concludes that the ALJ's determination that Plaintiff was not disabled due to her impairments and combination of impairments is supported by the substantial evidence of record and, therefore, is due to be affirmed.

---

[23] Plaintiff says that Dr. Zelaya's opinion supports her claim that she can "barely get through an 8 hour work day." Doc. 14, p. 18. This argument is confusing because Dr. Zelaya said no such thing. Rather, Dr. Zelaya opined that Plaintiff could sit for a total of six hours, stand for a total of one hour and walk for a total of one hour in an 8 hour work day. Thus, according to Dr. Zelaya Plaintiff can work throughout an 8 hour work day so long as the work is divided into sitting for no more than six hours, standing for no more than one hour and walking or no more than one hour. The ALJ expressly asked the VE to assume that a claimant was limited consistent with Dr. Zelaya's opinion. The VE identified a significant number of jobs in the national economy that such an individual could perform. As such, the ALJ's conclusion that Plaintiff is not disabled is fully supported by substantial evidence.

## V. CONCLUSION

In light of the foregoing, it is respectfully **RECOMMENDED** that the

Commissioner's decision should be **AFFIRMED**.

**IN CHAMBERS** this 3rd  day of August, 2015.

*s / Gary R. Jones*

GARY R. JONES
United States Magistrate Judge

### NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636**.